UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN TODD WILLIAMS,<br><br>          Movant,<br><br>  -v-<br><br>UNITED STATES OF AMERICA,<br><br>         Respondent. | No. 20-cv-1554 (RJS) |
| UNITED STATES OF AMERICA<br><br>  -v-<br><br>JOHN TODD WILLIAMS,<br>         Defendant. | No. 14-cr-784 (RJS)<br><br><br><br>MEMORANDUM AND ORDER |

RICHARD J. SULLIVAN, Circuit Judge:

John Todd Williams, proceeding pro se, moves the Court under 28 U.S.C. § 2255 to vacate

or set aside his 2016 conviction and sentence for conspiring, in violation of 18 U.S.C. § 1349, to

commit wire fraud (a substantive offense defined at 18 U.S.C. § 1343).  For the reasons set forth

below, Williams's motion is DENIED.

## I.     BACKGROUND[1]

Williams is the former owner and manager of Williams Scott & Associates, LLC ("WSA"),

a debt collection agency based in Georgia.  (PSR ¶ 14.)  From 2009 through May 2014, Williams

---

[1] The facts are drawn from Williams's presentence investigation report ("PSR"). In making its ruling, the Court has also considered Williams's motion to vacate (Doc. No. 278), the government's memorandum in opposition to the motion (Doc. No. 284), and Williams's reply to the government's memorandum (No. 20-cv-1554, Doc. No. 27), as well as all attached exhibits.  Unless otherwise specified, all citations to ECF documents refer to the docket in Williams's criminal case, No. 14-cr-784.

supervised and directed a ring of WSA employees in a scheme to collect payment from victims on their actual or purported debts by making fraudulent, misleading, and coercive statements to such victims over the telephone and by email.  (PSR ¶¶ 1, 2, 14, 19.)  Specifically, WSA employees induced victims to pay WSA by falsely claiming to represent various law enforcement agencies, either real (e.g., the United States Marshals Service and Department of Justice) or fictitious (e.g., the "Warrant Services Association, A Division of the Federal Government Task Force"), then falsely threatening victims with arrest or suspension of their drivers' licenses unless they immediately paid WSA.  (PSR ¶¶ 21–23.)  During the duration of Williams's time supervising the scheme, WSA received approximately $3.9 million in debit and credit card payments from 6,005 victims.  (PSR ¶ 17.)

In November 2014, Williams was arrested and charged with conspiracy to commit wire fraud.  (PSR at 1.)  After a five-day trial, the jury returned a guilty verdict on July 12, 2016.[2] (Doc. No. 192.)   In November 2016, the Court sentenced Williams to a term of five years' imprisonment, to be followed by three years' supervised release, and imposed orders of forfeiture and restitution, each in the amount of $3,995,443.53.  (Doc. No. 218, at 57, 58, 60, 63–64.) Williams appealed from the Court's judgment on twelve grounds, including several that he attempts to revive here.  (Doc. Nos. 220, 221, 222; 2d. Cir. No. 16-4186, Doc. No. 116.)  The Second Circuit appointed appellate counsel for Williams under the Criminal Justice Act (2d Cir. No. 16-4186, Doc. No. 22), but he requested that such counsel be relieved and chose instead to proceed pro se on appeal (2d Cir. No. 16-4186, Doc. No. 39).  The Second Circuit affirmed his conviction and sentence on May 30, 2018.  *United States v. Williams*, 736 F. App'x 267, 273 (2d

---

[2] Immediately prior to trial, Williams's case was reassigned from Judge Torres to my docket.  (*See* Doc. No. 173.)

Cir. 2018).

On February 20, 2020, Williams filed a pro se petition for the Court to vacate or set aside his conviction and sentence pursuant to 28 U.S.C. § 2255.  (Doc. No. 278.)  The Court ordered the government to respond (Doc. No. 279), which it did on May 15, 2020 (Doc. No. 284).

On May 29, 2020, Williams moved this Court, in essence, to immediately grant his section 2255 petition on the ground that the government had putatively defaulted by allegedly failing to file a timely response to the petition.  (No. 20-cv-1554, Doc. No. 10 (styled as "motion to di[s]miss [Williams's criminal] case for non[]response . . . to plaintiff[']s motion 28 U.S.C. 2255").)   The Court terminated that motion in a June 9, 2020 order noting that the government *had* in fact filed a timely response and therefore "declin[ing] to rule on Williams's § 2255 motion at th[at] time." (Doc. No. 286.)  Williams filed a second, largely identical "motion to di[s]miss [his criminal] case for non[]response . . . to plaintiff[']s motion 28 U.S.C. 2255" on June 23, 2020.  (Doc. No. 287.)  In a July 31, 2020 order, the Court again "decline[d] to rule on Williams's § 2255 motion at th[at] time," for "the same reasons outlined in its June 9, 2020 order." (Doc No. 288 at 1.)  Williams appealed from the June 9 order denying his first such motion (No. 20-cv-1554, Doc. No. 17), but on February 9, 2021, the Second Circuit dismissed his appeal for lack of jurisdiction, noting that this Court had "not issued a final order as contemplated by 28 U.S.C. § 1291" (No. 20-cv-1554, Doc. No. 30 at 1).

While his appeal was pending, Williams also filed a recusal motion in the district court (No. 20-cv-1554, Doc. No. 16), which this Court denied on July 31, 2020 (Doc. No. 289).  Between August 31 and September 9, 2020, Williams filed three additional motions (1) for stay pending appeal, (2) to appoint counsel, and (3) to provide minutes for a (nonexistent) February 20, 2020 proceeding before Magistrate Judge Robert W. Lehrburger.  (No. 20-cv-1554, Doc. Nos. 21, 22,

23.)  The Court denied these three motions in a single consolidated order on September 18, 2020. (Doc. No. 291.)  Williams appealed from the July 31 and September 18 orders denying his various motions (No. 20-cv-1554, Doc. No. 28), but then moved in the Second Circuit to voluntarily withdraw this appeal; the Second Circuit granted that motion and deemed Williams's appeal as to those motions withdrawn on January 6, 2021 (*see* No. 20-cv-1554, Doc. No. 29).

Since August 6, 2021, Williams has sent several letters to various judges and employees of this Court, accusing the Court, "the FBI[,] and U.S. Marshals [of] spying and illegally tracking Williams'[s] cell phone" and attempting to "intimidate and entrap Mr. Williams." (No. 20-cv-1554, Doc. Nos. 33, 34.)  He has also expressed dissatisfaction with the fact that his petition remained on the undersigned's docket pursuant to 28 U.S.C. § 291 even after the undersigned was appointed as a Circuit Judge for the Second Circuit.  (No. 20-cv-1554, Doc. Nos. 31, 32, 33.)  It appears that Williams's dissatisfaction may be rooted in his previously expressed concern that the Court is now "weigh[ing] in on this case as an Appeals Judge" after having "formerly worked on the [same] case as a District Judge" – i.e., acting as "an Appeals Judge and a District Judge [in] the same [case]" – so as to create an "[i]mpression of bias" or "conflict of interest." (No. 20-cv-1554, Doc. No. 16 at 1–2.)  The Court has already sought to explain, in its July 31, 2020 order denying Williams's recusal motion, how that is not the case.  (Doc. No. 289 at 1–4.)  But to avoid even the possibility of confusion, it bears repeating that the undersigned is *not* sitting as a Circuit Judge reviewing the District Court judgment.  Rather, the Court here is sitting by designation *as a District Judge* – specifically, in his capacity as the District Judge who presided over the trial and sentencing in the criminal case *within which the instant section 2255 motion was brought*.  It is standard operating procedure – expressly provided for by statute and repeatedly upheld by the Second Circuit – that a section 2255 motion should come before the judge who oversaw the trial

and sentencing in the court of conviction. *See* 28 U.S.C. § 2255(a) ("A prisoner in custody under sentence of a [federal] court . . . may move *the court which imposed the sentence* to vacate, set aside or correct the sentence." (emphasis added)); Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 3, Advisory Committee Notes (noting "the nature of a § 2255 motion as being *a continuation of the criminal case* whose judgment is under attack" (emphasis added)); *Polizzi v. United States*, 926 F.2d 1311, 1320 (2d Cir. 1991) (holding that "it is not a ground for disqualification [from a section 2255 proceeding] that the . . . judge also handled the original trial and sentence"); *Zovluck v. United States,* 448 F.2d 339, 443 (2d Cir. 1971) (holding same); *United States v. Delsanter*, 433 F.2d 972 (2d Cir. 1970) (holding same); *Mirra v. United States*, 379 F.2d 782, 787–88 (2d Cir.) (holding same).   Importantly, Williams should understand that if he were to appeal from this order to the Second Circuit, the undersigned judge would be recused and would not take part in the appeal.

With that background, the Court now addresses Williams's petition to vacate or set aside his conviction and sentence under section 2255, which is the only motion still pending before this Court.[3]  (Doc. No. 278.)

## II.   LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner "in custody" under sentence of a federal court "may move the court which imposed [that] sentence to vacate, set aside or correct the sentence" on the grounds that it "was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).[4]  However, a collateral attack (i.e., a

---

[3] In this Memorandum and Order, the Court will refer interchangeably to Williams's pending filing under 28 U.S.C § 2255 as a "motion" and as a "habeas petition."  *See, e.g.*, *Davis v. United States*, 417 U.S. 333, 343 (1974) (noting that the "§ 2255 motion to vacate, set aside, or correct a sentence is "a remedy identical . . . to federal habeas corpus").

[4] By the time he filed the instant habeas petition, Williams had been released from the custody of the Bureau of Prisons (i.e., had completed his term of imprisonment) and had begun his term of supervised release.  (Doc. No. 278 at 14;

petition for habeas relief) under § 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). "The reasons for narrowly limiting the relief permitted under § 2255 – a respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place – are 'well known and basic to our adversary system of justice.'" *Id.* (quoting *United States v. Addonizio,* 442 U.S. 178, 184 & n. 11 (1979)). To those ends, "the courts have established" certain rules, or procedural bars, "that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (citation omitted).

For one, a habeas petition under section 2255 generally "cannot be used to relitigate questions which were raised and considered on direct appeal." *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (internal quotation marks omitted); *see Chin v. United States*, 622 F.2d 1090, 1092 (2d Cir. 1980) ("[I]t is well-settled that 'once a matter had been decided adversely to a defendant on direct appeal it cannot be relitigated in a collateral attack.'" (quoting *United States v. Natelli*, 553 F.2d 5, 7 (2d Cir. 1977))). A court sitting in habeas jurisdiction may revisit such questions "only where there has been an intervening change in the law and the new law would have exonerated [the] defendant had it been in force before the conviction was affirmed on direct appeal." *Chin*, 622 F.2d at 1092. The habeas petitioner bears the burden to affirmatively "show

---

Doc. No. 284 at 5 n.4.) This does not present an impediment to the Court's jurisdiction over Williams's section 2255 petition. While section 2255 "confers jurisdiction to district courts to entertain habeas petitions for relief solely from persons who satisfy the status or condition of being 'in custody' at the time the petition is filed," the Second Circuit has made clear that "a petitioner under supervised release may be considered 'in custody.'" *Scanio v. United States*, 37 F.3d 858, 860 (2d Cir. 1994).

6

that there is new law which, when applied to [his or her] claims, would result in a different disposition," *id.*; absent such a showing, the petitioner is, "as a threshold matter, . . . collaterally estopped from relitigating [such] issue[s]," *Sanin*, 252 F.3d at 83.

Likewise, where a defendant has "procedural[ly] default[ed]" a claim of error – either by "fail[ing]" to raise it on direct appeal despite having "the opportunity to" do so, *United States v. Munoz*, 143 F.3d 632, 637 (2d Cir. 1998), or by failing to properly preserve it at trial, *United States v. Frady*, 456 U.S. 152, 158–59 (1982) – he or she generally will be barred from raising such claim for the first time in a postconviction habeas petition.  The habeas court may consider a procedurally defaulted claim only if the petitioner first shows either (1) that he or she had "cause" for the procedural default and suffered actual "prejudice" from the error at issue, or (2) that he or she is "actually innocent" of the crime of conviction.  *Bousley v. United States*, 523 U.S. 614, 622 (1998).

Regarding the "cause-and-prejudice" gateway through procedural default, the Supreme Court has recognized (as relevant here) that *constitutionally* "[i]neffective assistance of counsel . . . is cause for a procedural default."[5]  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  But merely "ignorant or inadvertent attorney error," such as counsel's failure to "recognize the factual or legal basis for a claim" or "to raise the claim despite recognizing it," will "not constitute cause for a procedural default."  *Id.* at 486.  Meanwhile, the "prejudice" prong requires a petitioner to "shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of

---

[5] More specifically, *Carrier* directs courts to analyze whether counsel was "*constitutionally* ineffective under the standard established in *Strickland v. Washington*."  477 U.S. at 488 (emphasis added).  *Strickland*, in turn, sets forth "two components" that "both" must be shown in order to establish that "counsel's assistance was so defective as to require reversal of a conviction."  466 U.S. 668, 687 (1984).  First, "the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  *Id.*  Second, "the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*

prejudice, but that they worked to his *actual* and substantial disadvantage." *Frady*, 456 U.S. at 170 (emphases in original).

As for the "actual innocence . . . gateway through" a procedural bar, the Supreme Court has "caution[ed] . . . that tenable actual-innocence gateway pleas are rare." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). In the same vein, that Court has clarified that "'actual innocence' means factual innocence, not mere legal insufficiency. In other words, the [g]overnment is not limited to the existing record to rebut any showing that petitioner might make." *Bousley*, 523 U.S. at 622 (internal citation omitted). Thus, only on a showing that "in light of all the evidence" (including "new evidence" proffered by the petitioner *or* the government), "it is 'more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt,' [may] a petitioner . . . invoke the actual innocence gateway and obtain review of the merits of his [procedurally defaulted] claims." *Doe v. Menefee*, 391 F.3d 147, 162 (2d Cir. 2004) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

### III.  DISCUSSION

In the section 2255 petition now before the Court, Williams points to four "ground[s] on which [he] claim[s] that [he is] being held in violation of the Constitution, laws, or treaties of the United States." (Doc. No. 278 at 5.)[6]  Specifically, he argues that: (1) the indictment against him was jurisdictionally defective because it charged only a wire fraud conspiracy, rather than a substantive wire fraud offense (Doc. No. 278 at 4; *see* Doc. No. 278 at 22, 25–26, 33–34); (2) his criminal prosecution was preempted and therefore barred by the Fair Debt Collection Practices Act's parallel civil enforcement scheme, 15 U.S.C. § 1692, for the same underlying conduct (Doc.

---

[6] Because the page numbering of Williams's section 2255 motion and supporting memorandum of law (Doc. No. 278) is inconsistent and at times lacking altogether, the Court will use the page numbers indicated on the ECF filing stamp.

No. 278 at 5; *see* Doc. No. 278 at 23–25, 32–33); (3) the search warrant, arrest warrant, and indictment in his criminal case were all altered, forged, procedurally defective, or otherwise invalid (Doc. No. 278 at 7; *see* Doc. No. 278 at 18–21, 26–30, 34–37); and (4) he received ineffective assistance of counsel ("IAC") from all six attorneys who represented him in the pretrial, trial, and sentencing stages of his criminal case (as well as a seventh attorney who represented him in a related civil case) (Doc. No. 278 at 8–9; *see* Doc. No. 278 at 38–71).

In the memorandum of law supporting and attached to his section 2255 petition, Williams breaks his IAC claim out into fifteen separate, "additional" purported "grounds to vacate" his conviction and sentence.  (Doc. No. 278 at 38; *see* Doc. No. 278 at 38–71.)  These fifteen "additional grounds" include:  (5) alleged IAC by the attorney who represented WSA in a civil enforcement action brought by the Federal Trade Commission in the Northern District of Georgia (*see* N.D. Ga. No. 14-cv-1599), but never represented Williams personally in any of his criminal proceedings in this Court (Doc. No. 278 at 38–39); (6, 7, 8, 9, 10, 11) the failure of each of Williams's pretrial- and trial-stage attorneys to advise him of the argument he now puts forth as Ground 1 in his main petition (Doc. No. 278 at 40–51); (12) the failure of Williams's pretrial- and trial-stage attorneys to advise him of the argument he now puts forth as Ground 2 in his main petition (Doc. No. 278 at 52–53);  (13) the failure of Williams's pretrial- and trial-stage attorneys to advise him to challenge the validity of the search warrant, as he now does in Ground 3 in his main petition (Doc. No. 278 at 54–58); (14) IAC resulting from the fundamental "breakdown of the attorney-client relationship" between Williams and Mark DeMarco, his appointed counsel at trial and sentencing (Doc. No. 278 at 58–60); (15) the alleged failure of pretrial counsel to make a bail application at Williams's initial appearance in this Court (Doc. No. 278 at 60–61); (16) the failure of all of Williams's pretrial- and trial-stage attorneys to advise him of the challenge, now

incorporated into Ground 3 in his main petition, to the validity of the arrest warrant (Doc. No. 278 at 61–62); (17) the alleged failure by trial counsel to investigate facts that putatively would have shown venue was improper in this District (Doc. No. 278 at 63–66); (18) the failure of Williams's pretrial- and trial-stage attorneys to advise him of the challenge, now incorporated into Ground 3 in his main petition, to the validity of the indictment (Doc. No 278 at 66–68); and (19) the failure of Williams's pretrial- and trial-stage attorneys to advise him of the claim that his prosecution was vindictive and improperly motivated (Doc. No 278 at 68–70).[7]

Williams's nineteen putative "grounds to vacate" boil down to eight distinct claims of error that are "freestanding" in the sense that they do not merely "repackage" arguments already made elsewhere in Williams's section 2255 petition and supporting memorandum. *Cf. United States v. Overton*, 24 F.4th 870, 873 (2d Cir. 2022). Grounds 1, 2, and 3 each state freestanding claims of error in their own right. Grounds 5, 15, 17, and 19 each respectively assert that it was IAC for Williams's pretrial- and trial-stage counsel not to make a substantive legal argument that is not made elsewhere in Williams's petition and memorandum. Ground 14 is an IAC claim not tethered to counsel's putative failure to make *any* particular argument, but rather, based on a more fundamental alleged breakdown of the attorney-client relationship between Williams and DeMarco. All eleven of Williams's remaining "grounds" – Grounds 4, 6, 7, 8, 9, 10, 11, 12, 13, 16, and 18 – merely "repackage" the substantive arguments made as Grounds 1, 2, and 3, by

---

[7] This Memorandum and Order's references to "Ground 1," "Ground 2," etc., correspond to the numbering of Williams's claims as set forth in this and the immediately preceding paragraph, which in turn follow the numbering of claims in Williams's own section 2255 petition and accompanying memorandum (Doc. No. 278). Likewise, this Memorandum and Order will hereinafter use "Ground 3," "Ground 4," etc., to refer not only to each of William's putative "grounds to vacate" his conviction and sentence as set forth in the now-pending petition, but also to the substantive legal claims set forth in each such putative ground. Thus, the Court might refer to "whether Williams raised Ground 1 on direct appeal," for example, as shorthand for "whether Williams raised *the claim that the indictment against him was jurisdictionally defective insofar as it charged only a wire fraud conspiracy rather than a substantive wire fraud offense – a claim set forth as Ground 1 in his section 2255 petition now pending before the Court* – on direct appeal."

contending it was IAC for Williams's prior attorneys not to raise those arguments at or before trial.

For the reasons detailed below, none of William's eight claims of error avails him.  Two such claims – Grounds 5 and 15 – are outside the scope of this Court's jurisdiction on postconviction collateral review pursuant to a section 2255 petition.  *See infra* III.A.  Four such claims – Grounds 2, 3, 17, and 19 – are procedurally barred for already having been considered and rejected by the Second Circuit on direct appeal.  *See infra* III.B.  One such claim – Ground 1 – is barred because Williams procedurally defaulted it on direct appeal and has failed to make a cause-and-prejudice or actual-innocence showing sufficient to excuse that procedural default.  *See infra* III.C.  The one remaining freestanding claim of error that the Court *can* consider on the merits – Ground 14 – fails on the merits.  *See infra* III.D.

Nor is Williams entitled to habeas relief on any of the eleven remaining claims – Grounds 4, 6, 7, 8, 9, 10, 11, 12, 13, 16, or 18 – that "repackage" Grounds 1, 2, and 3 as IAC claims.  *See infra* III.E.  Those that repackage Grounds 2 and 3 (which were themselves considered and rejected on direct appeal) are barred by the Second Circuit's "mandate rule."  *See infra* III.E.1.  Those that repackage Ground 1 (which is itself facially meritless) fail on the merits of the *Strickland* IAC analysis.  *See infra* III.E.2.

**A.  Claims Jurisdictionally Barred**

It is axiomatic in American law that federal courts may entertain only claims over which they have subject-matter jurisdiction.  *See, e.g.*, *Turner v. Bank of N. Am.*, 4 U.S. (4 Dall.) 8, 10 (1799).  It is equally axiomatic that the subject-matter jurisdiction of the lower federal courts is subject not only to the limitations imposed by Article III of the Constitution, but also to those imposed by the statutes that grant jurisdiction in the first instance.  *See, e.g.*, *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 448–49 (1850).  Here, two of Williams's eight putative grounds for habeas

relief – Grounds 5 and 15 – are jurisdictionally barred, either statutorily or constitutionally. Therefore, the Court will not – and *may* not – reach the merits of such grounds. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of . . . dismissing the cause." (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).

### 1. Defects in Statutory Jurisdiction

Ground 5 – Williams's contention that he received IAC from the attorney who represented WSA in a civil enforcement action brought by the Federal Trade Commission in the Northern District of Georgia (*see* N.D. Ga. No. 14-cv-1599), but who never represented him personally in any of his criminal proceedings in this Court (Doc. No. 278 at 38–39) – is, by its terms, outside the scope of the habeas jurisdiction conferred on this Court by 28 U.S.C. § 2255. With respect to Ground 5, Williams is not "claiming the right to be released" from the criminal "sentence of a [federal] court," 28 U.S.C. § 2255(a), but rather attacking the constitutionality of a *civil* proceeding. Even if Williams *could* attack a civil judgment under section 2255 – and again, the Court is aware of no authority that even *remotely* suggests such a novel reading of the statute – he still presumably would have to "move the court which imposed" the civil judgment to "vacate" it or "set [it] aside." *Id.* Here, that court would be the Northern District of Georgia, not the Southern District of New York. Accordingly, the Court lacks statutory jurisdiction under 28 U.S.C. § 2255(a) to consider Williams's argument that he received IAC in violation of the Sixth Amendment in connection with his (or, more precisely, his former *company's*) civil case in the Northern District of Georgia. And in any event, it is firmly established that the Sixth Amendment furnishes no right to counsel – much less to *effective* counsel – in civil cases. *E.g.*, *Turner v.*

*Rogers*, 564 U.S. 431, 441–42 (2011); *accord United States v. Vilar*, 979 F. Supp. 2d 443, 445–46 (S.D.N.Y. 2013).

### 2. *Defects in Constitutional Jurisdiction*

Williams is also jurisdictionally barred from raising the claim, put forth as Ground 15 in his instant habeas petition, that he received IAC when his appointed pretrial counsel allegedly failed to make a bail application at Williams's initial presentment before this Court.  (Doc. No. 278 at 60–61.)  In the context of Williams's postconviction challenge under section 2255, Ground 15 is moot.  It is well-established within this Circuit that "[c]laims of ineffective assistance of counsel related to bail are rendered moot upon conviction and sentence."  *Patterson v. United States*, 12-cr-823 (JFK), 2016 WL 3162069, at *4 (S.D.N.Y. June 2, 2016); *see also Thorne v. Warden, Brooklyn House of Det. of Men*, 479 F.2d 297, 299 (2d Cir. 1973) (holding same); *King v. Greiner*, 453 F. App'x 88 (2d Cir. 2011), *aff'g* No. 02-cv-5810 (DLC), 2009 WL 2001439 (S.D.N.Y. July 8, 2009), *adopting* No. 02-cv-5810 (AJP), 2008 WL 4410109, at *54 (S.D.N.Y. Sept. 26, 2008) (holding same).  Thus, "to the extent that [a petitioner for postconviction habeas relief] challenges his [pretrial] counsel's failure to obtain bail on his behalf," such a claim will be deemed to have "bec[o]me moot upon his conviction and sentence."  *Boyd v. Hawk*, 965 F. Supp. 443, 451 (S.D.N.Y. 1997) (quoting *Hernandez v. Senkowski*, No. 93-cv-5763, 1995 WL 604703, at *3 (E.D.N.Y. 1995) (applying *Thorne*, 479 F.2d at 299 (2d Cir. 1973))).  In turn, where a claim is moot, "the federal courts lack subject matter jurisdiction" to consider it "[u]nder Article III of the U.S. Constitution."  *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (quoting *Fox v. Bd. of Trs. of State Univ. of N.Y.,* 42 F.3d 135, 140 (2d Cir. 1994) (alterations omitted)).

**B. Claims Procedurally Barred for Collateral Estoppel**

The four claims of error now put forth in Williams's section 2255 petition as Grounds 2, 3, 17, and 19 were all presented to, considered by, and ultimately rejected on the merits by the Second Circuit on direct appeal.[8]  Because these claims were "decided adversely to [Williams] on direct appeal," *Chin*, 622 F.2d at 1092 (quoting *Natelli*, 553 F.2d at 7), there arises a "threshold" presumption that he is "collaterally estopped from relitigating [such] issue[s]" in "a § 2255 petition."  *Sanin*, 252 F.3d at 83.  Such presumption may be rebutted – i.e., this Court may be "permitted" to "[r]econsider" the claims already decided adversely to Williams by the Second Circuit in 2018 – "*only* [if] there has been an intervening change in the law and the new law would have exonerated [Williams] had it been in force before [his] conviction was affirmed on direct appeal."  *Chin*, 622 F.2d at 1092 (emphasis added).  It is Williams who bears the burden to affirmatively "show" both (1) the existence of intervening change(s) in law applicable to Grounds 2, 3, 17, or 19, and (2) that such "new law . . . , when applied to [those] claims, would result in a different disposition."  *Id.*  Yet nowhere in the habeas petition now before this Court does Williams even attempt to make such showings.  (*Cf. generally* Doc. No. 278.)  Therefore, on the instant challenge to his conviction and sentence, Williams is collaterally estopped from asserting Grounds 2, 3, 17, and 19, and this Court is not "permitted" to "reconsider[]" the Second Circuit's 2018

---

[8] (*Compare* Doc. No. 278 at 5, 23–25, 32–33 (Ground 2), *with* 2d Cir. No. 16-4186, Doc. No. 116 at 14, 18, 30 (raising same claim on direct appeal), *and Williams*, 736 F. App'x at 270–71 (rejecting same on direct appeal).  *Compare* Doc. No. 278 at 7, 18–21, 26–30, 34–37 (Ground 3), *with* 2d Cir. No. 16-4186, Doc. Nos. 116 at 14, 18, 30; 141 at 86–88 (raising same claim on direct appeal), *and Williams*, 736 F. App'x at 270–71 & n.3 (rejecting same on direct appeal; providing independent analysis and incorporating by reference Doc. No. 171 at 3–8 (this Court's analysis for rejecting, at pretrial conference, component part of claim now made as Ground 3)).  *Compare* Doc. No. 278 at 63–66 (Ground 17), *with* 2d Cir. No. 16-4186, Doc. No. 116 at 15–18 (raising same underlying claim on direct appeal), *and Williams*, 736 F. App'x at 271 (rejecting same on direct appeal).  *Compare* Doc. No. 278 at 68–70 (Ground 19), *with* 2d Cir. No. 16-4186, Doc. Nos. 116 at 15, 163, 164, 168; 141 at 66, 88; 182 at 11, 13, 69, 71 (raising same underlying claim on direct appeal), *and Williams*, 736 F. App'x at 270 (rejecting same on direct appeal; incorporating by reference Doc. No. 171 at 3–8 (this Court's analysis for rejecting, at pretrial conference, underlying substantive claim nested in IAC claim now made as Ground 19)).)

rulings against Williams on the issues implicated in such putative grounds to vacate. *Chin*, 622 F.2d at 1092.

The Court nevertheless assumes, without deciding, that Williams is *not* collaterally estopped from raising Ground 1 (Doc. No. 278 at 4). While conceding that he did not raise Ground 1 in his merits-stage briefs on direct appeal to the Second Circuit, Williams accurately notes that he *did* raise it in his petition for rehearing en banc (Doc. No. 278 at 4; *see* 2d Cir. No. 16-4186, Doc. No. 332 at 4), which the Second Circuit denied in a one-line order (2d Cir. No. 16-4186, Doc. No. 335). Accordingly, there is some ambiguity as to whether Williams is "collaterally estopped from relitigating" Ground 1 on his instant section 2255 habeas petition. *Sanin*, 252 F.3d at 83. The resolution of that ambiguity would turn on a legal question that neither the Supreme Court nor the Second Circuit have been called upon to consider: whether a claim raised for the first time in a petition for rehearing en banc – particularly in a petition for rehearing en banc that, as here, was denied without analysis or acknowledgment of the claim at issue – may be deemed to have been "raised and considered on direct appeal" under *Sanin*. *Id.* But whether or not Williams is collaterally estopped from raising Ground 1, it is obvious, as explained below, that Ground 1 of Williams's habeas petition is procedurally barred on grounds of unexcused procedural default.

### C. Claims Procedurally Barred for Unexcused Procedural Default

Generally, a party will be deemed to have procedurally defaulted a claim, so as to be presumptively "barred from raising th[at] claim in a subsequent § 2255 proceeding," where he or she "had the opportunity to [raise it] on direct appeal and failed to do so." *Munoz*, 143 F.3d at 637. To obtain review of the merits of any claim he procedurally defaulted, Williams would first need to affirmatively show either (1) that he had "cause" for the procedural default and suffered actual "prejudice" from the error at issue, or (2) that he is "actually innocent" of the crime of

conviction. *Bousley*, 523 U.S. at 622.

Williams does not dispute that he "had the opportunity," *Massaro,* 538 U.S. at 503-04., to raise Ground 1 on direct appeal. His only explanation for why he "did not raise this issue in [his] direct appeal" was that he "wasn't aware of this law until [he] found it in the prison law library." (Doc. No 278 at 4.) Indeed, that Williams had the requisite "opportunity" to raise Ground 1 on direct appeal is confirmed by the fact that he actually *did* raise it in his petition for rehearing or rehearing en banc (2d Cir. No. 16-4186, Doc. No. 332 at 4–6, 9), which he filed after the Second Circuit affirmed his conviction and rejected each of the eleven claims of error (raised in his merits-stage appellate briefs.[9]   Because Williams "had the opportunity to" raise Ground 1 "on direct appeal and failed to do so," he has procedurally defaulted that claim and is presumptively "barred from raising [it] in [the instant] § 2255 proceeding." *Munoz*, 143 F.3d at 637. Thus, the Court may not reach the merits of Ground 1 unless Williams can "first demonstrate either 'cause' and actual 'prejudice,'" *Bousley*, 523 U.S. at 622 (quoting *Carrier*, 477 U.S. at 485; and *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977)), "or that he is 'actually innocent,'" *id.* (quoting *Carrier*, 477 U.S. at 496; and *Smith v. Murray,* 477 U.S. 527, 537, (1986)). As explained below, neither of these "gateways," *Perkins*, 569 U.S. at 386, is available to Williams on Ground 1.

---

[9] Williams's opening brief in the Second Circuit presented twelve issues for appeal. (2d Cir. No. 16-4186, Doc. No. 116 at *ii*.) In his reply brief, Williams reframed what his opening brief had called "Argument Two" as an argument in support of what both briefs refer to as "Argument One," rather than a freestanding claim of error unto itself – thus leaving eleven issues for the panel to consider. (2d Cir. No. 16-4186, Doc. No. 182 at *ii*.) Observing that four of those eleven arguments had also been raised in Williams's "pre-trial motions to suppress and to dismiss the indictment," the panel – after performing its own "independent review of the record and relevant law" – affirmed this Court's rejection of such arguments and incorporated by reference this Court's "reasons [for rejecting them as] stated on the record by [this Court] in its June 6, 2016 ruling," *Williams*, 736 F. App'x at 270, which were themselves quite thorough, spanning six pages of the transcript from Judge Torres's pretrial conference (Doc. No. 171 at 3–8). For the remaining seven issues, the Second Circuit panel provided seven additional pages (as printed in the slip opinion) of its own, similarly thorough analysis. *See Williams*, 736 F. App'x at 270–74; (*see also* 2d Cir. No. 16-4186, Doc. No. 308 at 3–9 (slip op.)).

### 1.  Cause and Prejudice

Nowhere in his petition or supporting memorandum of law does Williams even attempt to make a showing of cause and actual prejudice in relation to his procedural default of Ground 1. (*See generally* Doc. No. 278).[10]   Because it is Williams who "must shoulder the burden of showing" cause and prejudice, *Frady*, 456 U.S. at 170, his failure even to *attempt* such a showing is dispositive, *see, e.g.*, *Jones v. Murphy*, 694 F.3d 225, 248 (2d Cir. 2012); *Vargas v. Keane*, 86 F.3d 1273, 1280 (2d Cir. 1996); *Atkins v. Miller*, 18 F. Supp. 2d 314, 319 (S.D.N.Y. 1998).  In any event, there is no doubt that Williams would be unable to make an adequate showing of cause and prejudice even if he *had* so attempted.

As for cause, Williams cannot not rely on a theory of appellate IAC because he freely elected to proceed pro se on direct appeal (2d Cir. No. 16-4186, Doc. No. 39), after affirmatively choosing to dismiss the first appellate counsel originally appointed for him by this Court (Doc. No. 72; Minute Entry Nov. 21, 2016; 2d Cir. No. 16-4186, Doc. No. 19) and then subsequently dismissing the substitute appellate counsel appointed for him by the Second Circuit (2d Cir. No. 16-4186, Doc. Nos. 22, 38).  While the Supreme Court has recognized a constitutional right to counsel on direct appeal from a criminal conviction, *Douglas v. California*, 372 U.S. 353, 356–57 (1963), that right is alienable upon a defendant-appellant's invocation of his or her corresponding "Sixth Amendment . . . . right to self-representation," *Faretta v. California*, 422 U.S. 806, 819

---

[10] Indeed, he does not even offer so much as a bald *recitation* of "cause and actual prejudice" in relation to that claim. Rather, Williams explicitly characterizes the putative error with respect to this issue (he does not specify whether he would ascribe such error to the trial court, to the appellate court, or to both) as "PLAIN ERROR."  (Doc. No. 278 at 4 (capitalization in original).)  But the Supreme Court has gone out of its way to emphasize that "use of the 'plain error' standard to review [a procedurally defaulted claim in a petitioner's] § 2255 motion" would be "contrary to long-established law." *Frady*, 456 U.S. at 166; *see also id.* ("Because it was intended for use on direct appeal, . . . the 'plain error' standard is out of place when a prisoner launches a collateral attack against a criminal conviction after society's legitimate interest in the finality of the judgment has been perfected by . . . the affirmance of the conviction on appeal."); *id.* at 165 (collecting Supreme Court cases, dating back to the turn of the Twentieth Century, that support this point).

(1975). In order words, the Constitution does not impose an absolute requirement that every defendant *be represented by counsel* on direct appeal from a criminal conviction; rather, what is "required . . . under the Constitution" is that courts "honor [a defendant's] *request* for appointed counsel on appeal." *Coleman v. Thompson*, 501 U.S. 722, 742 (1991) (emphasis added). And it is well settled that once "a defendant . . . elects to represent himself," he "cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Faretta*, 422 U.S. at 834.

As for the prejudice prong, Williams's burden is to show that his otherwise–procedurally defaulted claim of error goes to "an error" that "not merely . . . created a *possibility* of prejudice, but . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphases in original). But Williams fails to identify *any* error based on the fact that the indictment charged wire fraud conspiracy without also charging a substantive wire fraud offense. *See infra* III.E. It follows, a fortiori, that if Ground 1's putative claim of error is not *an error* in the first place, it could not possibly be so egregious as to "infect[] his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. Indeed, much as it is "beyond a doubt" that an attorney's "failure to make a meritless argument" cannot "amount to ineffective assistance," *United States v. Regalado*, 518 F.3d 143, 150 n.3 (2d Cir. 2008) (citations omitted and alteration incorporated), so too is it beyond any doubt that a court's "failure" to accept a meritless argument cannot amount to error "so egregious as to" rise to the level of "actual prejudice," *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998).

### 2. Actual Innocence

Because Williams "does not attempt to show cause and prejudice" "with respect to" Ground 1, he "must make a showing of actual innocence" in "order to obtain . . . habeas review of

[that] procedurally defaulted claim" – that is, he must show "that in light of all the evidence, more likely than not, no reasonable juror would have convicted him." *Atkins*, 18 F. Supp. 2d at 319. That he cannot do.

Although he *asserts* his "ACTUAL INNOCENCE" repeatedly throughout his habeas petition (Doc. No. 278 at 4, 7, 15, 39, 41, 43, 45, 47, 49, 51, 54 (capitalization in original)), Williams fails to ground such recitations in *factual* matter that undermines the Court's "confidence in the outcome of the trial" – whether by pointing to "new reliable . . . exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence[]" that was "tenably claimed . . . to have become available only after the trial" or "to have been wrongly excluded," or by urging "due regard to [the] unreliability" of evidence "alleged to have been illegally admitted" at trial. *Schlup*, 513 U.S. at 316, 324, 328 (quoting Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 160 (1970)). To the extent that Williams offers *any* grounding for his otherwise-bare assertions of "actual innocence," they are tethered to his claims of formal legal error – arguing, for example, that the FBI's use of an allegedly "invalid search warrant" (Doc No. 278 at 7) to conduct the search of WSA's office that uncovered key evidence of Williams's fraudulent debt collection (PSR ¶¶ 25, 26) was a "travesty in itself [that] clearly qualified [him] to plead . . . 'ACTUAL INNOCENCE.'" (Doc. No. 278 at 7 (capitalization in original.)) But the Supreme Court has made clear, time and again, that a claim of "actual *as compared to legal* innocence," *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992) (emphasis added), "requires [a] petitioner to support his allegations of constitutional error with new reliable [factual] evidence," *Schlup*, 513 U.S. at 324; *accord Bousley*, 523 U.S. at 622 ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency.").

Williams – unlike the habeas petitioners who made successful actual-innocence gateway

pleas in *Schlup*, 513 U.S. at 327–32, and *Sawyer*, 505 U.S. at 347–48 – does not proffer "evidentiary facts that were not considered by the jury that convicted . . . [him]," *id.* at 347.  Thus, the evidence "contained" in "the trial record" here *is coextensive with* "all the evidence" now available to "[t]he habeas court."  *Schlup*, 513 U.S. at 328, 331 (citation omitted).

Even a cursory review of the trial record reveals that there was ample evidence of Williams's involvement in the debt-collection scheme to support the jury's verdict.  (Doc. No. 186 at 5; Doc. No. 188 at 60–66, 79–81; Doc. No. 190 at 53–64.)   In addition to hearing audio recordings of many fraudulent phone calls, the jury also heard lengthy testimony from a cooperating witness about how WSA employees used written scripts prepared by Williams himself to execute the scheme and to defraud victims.  (Doc. No. 190, at 56–59; Doc. No. 186, at 30, 143.)  Photographs showed that these scripts were posted on cubicle walls around the WSA office (Doc. No. 188 at 150–152; Doc. No. 190 at 22–23, 110–11), and Williams himself confirmed that he kept such scripts in his own desk drawer (Doc. No. 190 at 201, 203).  One cooperating witness also noted that whenever Williams devised a new script that he thought would be effective at inducing debtors to pay WSA, he would instruct employees to use it.  (Doc. No. 186 at 32.)  A victim testified that in March of 2013, she received a call directly from Williams, who told her that he was a lawyer affiliated with the FBI and that a warrant would be issued for her arrest if she did not pay WSA.  (Doc. No. 186 at 5.)  In the face of such evidence – which, again, Williams has made no attempt to counteract with proffers of newly discovered or improperly excluded exculpatory evidence – the Court finds that he falls *far* short of showing that it is "more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt."  *Doe*, 391 F.3d at 162 (quoting *Schlup*, 513 U.S. at 327).  In turn, he cannot "invoke the actual innocence gateway [to] obtain review of the merits of his [procedurally defaulted] claims."  *Id.*

20

\*            \*            \*

Because Williams "had the opportunity to [raise] on direct appeal" the claim he now puts forth as Ground 1 but "failed to do so," he has procedurally defaulted that claim. *Munoz*, 143 F.3d at 637. And because he fails to "demonstrate either 'cause' and actual 'prejudice'" in relation to that procedural default specifically, or "that he is 'actually innocent'" generally, his procedural default cannot be excused. *Bousley*, 523 U.S. at 622 (internal citations omitted). Thus, the Court concludes that he is procedurally barred from raising Ground 1 in this petition. *Id.*

### D. Ground 14 Claim of IAC Based on DeMarco's Alleged Conflict of Interest

Even though Williams did not raise the IAC claim in Ground 14 on direct appeal, that claim is not procedurally defaulted. Williams contends that he did not have the "opportunity," *Munoz*, 143 F.3d at 637, to raise Ground 14 on direct appeal, because he "was told" by someone – he doesn't say who – that he "could not bring up any ineffective assistance of counsel claims on direct appeal, only in a 2255 motion." (Doc No. 278 at 8.) While it is not *technically* true that Williams could not have raised an IAC claim on direct appeal,[11] that does not undermine his point, since the Supreme Court has expressly "h[e]ld that an ineffective-assistance-of-counsel claim *may* be brought in a collateral proceeding under § 2255" – with no requirement that "the petitioner show[] cause and prejudice" or actual innocence – irrespective of "whether or not the petitioner *could have* raised the [IAC] claim on direct appeal." *Massaro*, 538 U.S. at 503–04 (emphasis added). Thus, Ground 14 is not procedurally defaulted, and the Court will reach its merits. *See infra* III.D.

---

[11] To be sure, the Second Circuit has claimed for itself the *discretion* to simply "decide" a "claim for ineffective assistance of counsel on direct appeal." *United States v. Tarbell*, 728 F.3d 122, 128 (2d Cir. 2013) (quoting *United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003)). At the same time, Williams's understanding faithfully tracks the Second Circuit's expression of a "baseline aversion to resolving ineffectiveness claims on direct review," which has *generally* led that court, "when faced with a claim for [IAC] on direct appeal," to "decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255." *Id.* (quoting *Morris*, 350 F.3d at 39).

Ground 14 is an IAC claim, but unlike the eleven other IAC claims raised in Williams's habeas petition, its charge of ineffective assistance is not tethered to previous counsel's putative failure to preserve any *particular* substantive claim at trial. Rather, the gravamen of Ground 14 is that there was a more fundamental and "complete breakdown of the attorney-client relationship" between Williams and his court-appointed counsel at trial and sentencing, Mark DeMarco. (Doc. No. 278 at 59

To show that DeMarco's representation was indeed "so defective as to require reversal of a conviction," *id.*, Williams must show (1) "'that [DeMarco's] performance was so deficient' that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance,'" and (2) "'that [DeMarco's] deficient performance prejudiced [his] defense,' in the sense that 'there is a reasonable probability that, but for [DeMarco's] unprofessional errors, the result of the proceeding would have been different,'" *Bennett v. United States,* 663 F.3d 71, 84 (2d Cir. 2011) (quoting *Strickland*, 466 U.S. at 687, 690, 694). "[P]rejudice is presumed when counsel is burdened by an actual conflict of interest," but Williams may avail himself of such a presumption "only if" he makes threshold showings "that [DeMarco] 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected [DeMarco's] performance.'" *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980) (alteration incorporated)). "Conflict of interest claims aside," however, Ground 14 would remain "subject to a general requirement that [Williams] affirmatively prove prejudice." *Id.* at 693. And thus, "if [Williams] fails to meet either the performance prong *or* the prejudice prong," the Court "must . . . reject[]" Ground 14's "IAC claim." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (quoting *Bennett*, 663 F.3d at 85) (emphasis added).

22

Here, Williams's theory of ineffective assistance centers around the fallout of his decision to sue DeMarco in the Northern District of Georgia for legal malpractice. (Doc. No. 278, Ex. II at 132:8–15, 132:18–22, 133:15; N.D. Ga. No. 16-cv-979, Doc. No. 1.) Williams filed that suit approximately seven months after the Court had appointed DeMarco to represent him (Doc. No. 72), following Williams's successive requests for substitution of each of the five attorneys previously appointed for him (Doc Nos. 8, 58, 181, 251; N.D. Ga. No. 14-mj-1037, Doc. No. 1), and just three months before he would ultimately proceed to trial with DeMarco still representing him (Minute Entry July 5, 2016). Per letters sent to the Court by Williams and described on the record by Judge Torres, it appears that Williams's decision to sue emerged out of his "complain[t]s that Mr. DeMarco ha[d] decided not to make specific [pretrial] motions that Mr. Williams believe[d] [were] meritorious." (Doc. No. 278, Ex. II at 132:20–21.) Indeed, several months prior to Williams's filing suit, he and DeMarco had each separately requested that the Court terminate their relationship, citing "profound . . . . disagreements extend[ing] well beyond differences as to the legal strategy to be employed and the type of motions that should be filed." (Doc. No. 83 at 1.)

Upon being served with the summons and complaint from Williams's malpractice case against him, DeMarco renewed his motion for this Court to relieve him of his appointment as defense counsel to Williams. (Doc. No. 115.) At the hearing on such motion, DeMarco contended that he should be relieved "on the grounds that [Williams's malpractice] lawsuit creates a conflict of interest." (Doc. No. 278, Ex. II at 132:15–17.) DeMarco also averred that "[a]s long as I am a defendant [in Williams's malpractice suit], I'm not going to communicate with him out of fear that I say something that can be used against me in that lawsuit;" he then concluded that "if I can't communicate with Mr. Williams, there is no way under *Strickland v. Washington* . . . that he could

be provided with the effective assistance of counsel." (Doc. No. 278, Ex. II at 135:1–4, 136:12–14.) The Court disagreed and ruled that, in light of its finding that Williams had provoked the conflict and sued DeMarco "with a conscious purpose to impede and thwart the orderly adjudication of the case against [him]" (Doc. No. 278, Ex. II at 133:5–10 (quoting *United States v. Biear*, No. 09-cr-1185 (PKC), 2012 WL 946964, at *5 (S.D.N.Y. Mar. 20, 2012))), Williams's "filing of a malpractice lawsuit" did not constitute "a conflict of interest between [Williams] and Mr. DeMarco that warrants appointing [Williams new] counsel" (Doc. No. 278, Ex. II at 133:11–17 (citing *Mathis v. Hood*, 937 F.2d 790, 796 (2d Cir. 1991))). As to DeMarco's assertion that his status as a defendant in Williams's malpractice suit would preclude him from engaging in the communication necessary to render effective assistance, the Court ordered DeMarco to "communicate with [Williams] if I direct you to." (Doc. No. 278, Ex. II at 136:15–16.) The Court then gave Williams the "choice" to "continue with Mr. DeMarco as [his] lawyer or represent [him]self and have [DeMarco] as an adviser," and Williams answered, "I will use Mr. DeMarco." (Doc. No. 278, Ex. II at 134:11–17.)

In the arguments he now makes in support of Ground 14, Williams relies heavily upon DeMarco's statements "in open court that Mr. Williams would receive ineffective assistance if he [were] not removed from [Williams's] case," and contends that, "true to his word," DeMarco did "nothing to help Mr. Williams in his trial or sentencing." (Doc. No. 278 at 58–59.) As proof that DeMarco "did nothing to help" him, Williams points only to DeMarco's alleged failure to call "any witnesses" for the defense at trial. (Doc. No. 278 at 59–60.)

### 1. Conflict of Interest

Before assessing whether Williams satisfies the "deficient performance" and "prejudice" prongs of *Strickland*, the Court must first determine whether there was "an actual conflict of

interest" between DeMarco and Williams given Williams's suit against DeMarco in the Northern District of Georgia, in which case "prejudice [would be] presumed" and Williams would be relieved of his burden to establish that element of IAC.  *Strickland*, 466 U.S. at 692; *see also Mathis*, 937 F.2d at 795 (suggesting, in dicta, that there "could" be certain "attorney conflicts of interest" constituting "per se violation[s] of the [S]ixth [A]mendment right to counsel").  The Court finds that in the circumstances of this case, there was no actual conflict of interest sufficient to trigger such a presumption.

Courts in this District have recognized that "*[g]enerally speaking*, a lawsuit by a client against his lawyer may be considered as an automatic and effective termination of the attorney-client relationship."  *United States v. Birrell*, 286 F. Supp. 885, 896 (S.D.N.Y. 1968) (emphasis added).  But courts have also recognized that it would be incorrect "to say that this result follows inevitably," because "[t]he judicial process would be robbed of the flexibility so necessary for the practical administration of criminal justice if it were held that a defendant – who has failed by regular means to persuade the Court to change counsel – can successfully use the ploy of suing his own attorney in order to force the Court to accede to his demand for new counsel."  *Id.* at 896–97.  Thus, the law of the Second Circuit is that "[a] frivolous complaint against an attorney, or one filed for purposes of delay, or even one filed for the purpose of obtaining new counsel, would not create a conflict of interest warranting habeas relief."  *Mathis*, 937 F.2d at 796.

In the hearing on DeMarco's motion to be relieved, Judge Torres expressly found that Williams had sued DeMarco "with a conscious purpose to impede and thwart the orderly adjudication of the case against [him]."  (Doc. No. 278, Ex. II at 133:5–10 (citation omitted).)  Judge Torres *also* explicitly found that Williams's malpractice suit against DeMarco was "yet another frivolous accusation against an attorney after a long line of these meritless accusations."

(Doc. No. 278, Ex. II at 137:25–138:2).)  Indeed, Judge Torres noted that "Williams ha[d] filed a lawsuit against every lawyer who ha[d] represented him" prior to DeMarco.  (Doc. No. 278, Ex. II at 136:4–5).)  Because Williams does not challenge either of these findings – regarding his purpose of delay or the frivolity of his suit against DeMarco – in his petition, the Court has no reason to question Judge Torres's conclusion that Williams's lawsuit against DeMarco did "not create a conflict of interest warranting habeas relief" on a theory of any "per se violation of the [S]ixth [A]mendment right to counsel." *Mathis,* 937 F.2d at 795–96.

### 2. *Deficient Performance and Prejudice to Defense*

Unable to show any conflict of interest from which to infer a per se violation of his Sixth Amendment rights, Williams must (1) "identif[y]" specific "acts or omissions" by DeMarco that were "outside the wide range of professionally competent assistance," and (2) establish a "reasonable probability that, but for [those] unprofessional errors, the result of [Williams's] proceeding would have been different." *Bennett,* 663 F.3d at 84 (quoting *Strickland*, 466 U.S. at 690, 694).

As mentioned above, the only specific act *or* omission that Williams points to in support of his assertion that DeMarco "did nothing to help" him, is DeMarco's alleged failure to call "any [defense] witnesses for the trial, none, zero." (Doc. No. 278 at 59–60.)  For starters, this allegation is factually inaccurate:  DeMarco *did* call one defense witness – Williams himself. (Doc. No. 190 at 665:11–706:20.)  More to the point, the Court is aware of no authority setting a bright-line numerical quota for the *number of witnesses* a defense attorney must call at trial in order to render "professionally competent" assistance.  In fact, the Second Circuit has repeatedly held that, because "[t]he decision whether to call *any* witnesses on behalf of the defendant . . . is a tactical decision of the sort engaged in by defense attorneys in almost every trial," a defense attorney's

"decision not to call witnesses to testify" is not a per se "unreasonable trial tactic[]." *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) (quoting *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992)); *see also United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997) (noting that counsel's "tactical decision" not to call witnesses – "even ones [who] might offer exculpatory evidence" – is "ordinarily not viewed as a lapse in professional representation").  Rather, the general rule is that counsel's decision not to call any witnesses "cannot form the basis of a meritorious ineffective assistance claim," *Smith*, 198 F.3d at 386, absent an affirmative showing by the petitioner that his or her attorney failed to call at least one particular witness (or particular *kind* of witness, such as "alibi witnesses," *cf., e.g.*, *Ryan v. Rivera*, 21 F. App'x 33, 34 (2d Cir. 2001)) who would have been called by *any* attorney acting within "the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690.

Accordingly, for Williams to rebut the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, he must "identify . . . witnesses [whom DeMarco] should have called [and] who would have been helpful," *Nersesian*, 824 F.2d at 1321.  Williams fails to do so.  The closest he comes to such a showing is with his vague assertion that "if . . . DeMarco would have called witnesses[,] he could have shown . . . pro[of]" that WSA "was a legitimate collection agency of 14 years[,] not a fly by night scam or scheme."[12]  (Doc. No. 278 at 60.)  But even there, Williams offers no indication as to *whom* DeMarco should have called to testify, much less why their testimony would have been

---

[12] Williams also argues that "[i]f [DeMarco] would have brought in a professional witness for [Williams] like he asked him to, he could have easily showed and proved that the actions of the collection agents were not criminal matters, but a matter for the FTC."  (Doc. No. 278 at 60.)  In other words, he argues that DeMarco rendered IAC by declining to hire and call an expert witness to assert the purely legal argument that Williams now makes as Ground 2 in his instant petition.  (*See* Doc. No. 278 at 5, 23–25, 32–33.)  Because Williams is collaterally estopped from raising Ground 2, which was previously considered and rejected by the Second Circuit on direct appeal, *see supra* III.B, note 11, his effort here to "repackage" it as an IAC claim must fail for the same reason as his other such efforts to "repackage" claims rejected on direct appeal, *see infra* III.E.1.

material and likely to undermine the jury's findings as to any of the elements of the charged offense.  At bottom, because he does not "identify" any particular "witnesses [whom DeMarco] should have called" to testify at trial, *Nersesian*, 824 F.2d at 1321, Williams cannot point to DeMarco's putative "failure" to call additional trial witnesses as an "omission" that was "outside the wide range of professionally competent assistance," *Bennett*, 663 F.3d at 84 (quoting *Strickland*, 466 U.S. at 690).  This alone is fatal to his claim, and since Williams has "not establish[ed]" that DeMarco's decision not to call more trial witnesses was "a deficiency in representation," the Court "need not address the prejudice issue" with respect to that decision. *Chang v. United States,* 250 F.3d 79, 84 (2d Cir. 2001).

Nor has Williams demonstrated any prejudice stemming from DeMarco's continued representation of him following their asserted breakdown in communication.  *See, e.g.*, *Buitrago v. Scully*, 705 F. Supp. 952, 955–56 (S.D.N.Y. 1989) ("A defense attorney's failure to consult with his client is not a *per se* violation of a defendant's Sixth Amendment rights." (quoting *Healey v. People of State of N. Y.*, 453 F. Supp. 14, 16 (S.D.N.Y. 1978) (citing *Chambers v. Maroney*, 399 U.S. 42, 54 (1970))).  Throughout Williams's case, DeMarco filed pretrial motions, responded to the prosecution's motions, and vigorously represented Williams at trial by cross-examining the government's witnesses and putting on a defense case.  In fact, at the conclusion of the trial, the Court commend DeMarco for the quality of his "performance throughout the trial." (Doc. No. 218 at 9.)  Any lack of communication between Williams and DeMarco did not deprive Williams of effective assistance of counsel.

For all these reasons, the Court rejects, on the merits, the IAC claim put forth as Ground 14.

### E.  Remaining IAC Claims

Finally, having disposed of all eight freestanding legal claims contained in Williams's habeas petition – those asserted directly, as in Grounds 1, 2, 3, and 14, as well as those nested within nominal IAC claims, as in Grounds 5, 15, 17, and 19 – the Court is left with eleven remaining claims:  Grounds 4, 6, 7, 8, 9, 10, 11, 12, 13, 16, and 18.  Each takes the form of a contention that one or another of Williams's six trial- or pretrial-stage attorneys rendered IAC when they "failed" to "argue[]" one or another of the freestanding legal claims that the Court has now rejected as procedurally barred.  More specifically, Williams's remaining IAC claims focus on his prior attorneys' putative failures with respect to the claims now raised as Ground 1 (that the indictment against Williams was jurisdictionally defective insofar as it charged only a wire fraud conspiracy, rather than a substantive wire fraud offense (Doc. No. 278 at 4)), Ground 2 (that the government's criminal prosecution of Williams was preempted and thus barred by the Fair Debt Collection Practices Act's parallel *civil* enforcement scheme, 15 U.S.C. § 1692, for the same underlying conduct (Doc. No. 278 at 5)), and Ground 3 (that the government's search warrant, arrest warrant, and indictment as to Williams were all altered, forged, or procedurally defective, and therefore invalid (Doc. No. 278 at 7)).[13]  To recount, the Court has determined that Williams is procedurally barred from raising Grounds 2 and 3 on habeas because they were already considered and rejected on the merits by the Second Circuit on direct appeal.  *See supra* III.B.

---

[13] Grounds 6, 7, 8, 9, 10, and 11 each allege, respectively, that a different one of Williams's six previous attorneys failed to preserve Ground 1.  (Doc. No. 278 at 40–51.)  Ground 12 alleges that all six such attorneys failed to preserve Ground 2.  (Doc. No. 278 at 52–53.)  Grounds 13, 16, and 18 each allege that all six such attorneys failed to preserve the challenges (to the validity of the search warrant, arrest warrant, and indictment, respectively) that collectively make up Ground 3.  (Doc. No. 278 at 54–58, 61–62, 66–68.)  Ground 4, meanwhile, serves as a generalized, catch-all IAC claim (Doc. No. 278 at 8 ("Counsel was ineffective . . . .")), and thus as a kind of vessel for the fifteen more specific IAC claims asserted in Williams's memorandum of law (Doc No. 278 at 13–71) – the ten "non-standalone" IAC claims enumerated above and the five additional IAC claims (Grounds 5, 14, 15, 17, 19) that do *not* merely "repackage" the substantive arguments of Grounds 1, 2, and 3.  (Doc. No. 278 at 1–12.)  Thus, if all fifteen of Williams's more specific IAC claims fail, then so must Ground 4.

Likewise, the Court has already determined that Williams is procedurally barred from raising Ground 1 on habeas because he procedurally defaulted it.  *See supra* III.C.

Thus, the Court must now decide whether the procedural bars already found applicable to Grounds 1, 2, and 3 as substantive claims – unexcused procedural default for Ground 1, and collateral estoppel for Grounds 2 and 3 – are *also* dispositive of Williams's remaining IAC claims regarding his former attorneys' putative failure to preserve those substantive claims at trial.

### 1.  IAC Claims Barred by the Mandate Rule

Williams is barred from raising Grounds 12, 13, 16, and 18 (Doc. No. 278 at 52–53, 54–58, 61–62, 66–68) – which contend that it was IAC for his trial counsel not to raise the substantive arguments, now put forth as Grounds 2 and 3, that were ultimately considered and rejected by the Second Circuit on direct appeal – under the so-called mandate rule.  That rule is similar to the collateral estoppel rule that bars Ground 2 and 3 themselves, *see supra* III.B, but applies more broadly.  That is, the mandate rule "prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues *impliedly* resolved by the appellate court's mandate."  *Yick Man Mui*, 614 F.3d at 53 (emphasis added).  In unpublished opinions, which are not binding but nevertheless persuasive, both the Second Circuit and courts in this District have confirmed that the mandate rule applies on section 2255 habeas review to bar claims situated identically to Grounds 12, 13, 16, and 18 here.  Where the court of appeals has "considered and rejected variations of [given] arguments on direct appeal," an attempt to repackage those arguments in an "ineffective assistance of counsel claim fails because the mandate rule forecloses any argument that Petitioners were prejudiced by [trial] counsel's failure to adequately object to or argue [the substantive] issues [that are collaterally estopped]."  *Rodriguez v. United States*, 767 F. App'x 160, 164 (2d Cir. 2019), *aff'g* No. 14-cv-4628 (CSH),

2017 WL 6404900, at *4 (S.D.N.Y. Dec. 13, 2017) ("[A] claim presented in different terms and rejected on direct appeal may not thereafter be renamed or repackaged as an ineffective assistance claim and asserted in a habeas petition."). The Court therefore concludes that, because Grounds 12, 13, 16, and 18 are barred by the mandate rule, it may not consider them on the merits.

### 2.   IAC Claims Subject to Merits Review

The remaining IAC claims, put forth as Grounds 6, 7, 8, 9, 10, and 11 (Doc. No. 278 at 40–51), each allege that a different one of Williams's six previous pretrial- or trial-stage attorneys failed to raise the substantive argument now put forth as Ground 1 – namely, that the indictment against Williams was jurisdictionally defective because it charged only a wire fraud conspiracy, rather than a substantive wire fraud offense (Doc. No. 278 at 4). Because Ground 1 (in contrast to Grounds 2 and 3) is procedurally defaulted rather than collaterally estopped, *compare supra* III.C, *with supra* III.B, the Court will reach the merits of Williams's IAC claims based on his trial and pretrial counsel's putative failure to raise or preserve Ground 1. But given that the legal argument underlying Ground 1 is utterly frivolous, Williams's remaining IAC claims are easily rejected.

Williams faces an extraordinarily high burden to show that the alleged IAC of which he complains of in 6, 7, 8, 9, 10, and 11 constitutes grounds to vacate his sentence and conviction. It would not be enough for him to show merely that Ground 1 *might* have been a winning argument to have his indictment dismissed. *See United States v. Javino*, 960 F.2d 1137, 1145 (2d Cir. 1992); *see also Strickland*, 466 U.S. at 690 ("[S]trategic choices made [between] plausible options are virtually unchallengeable."). Rather, to prevail on any of these remaining six IAC claims, Williams must show that Ground 1 was such an obvious slam-dunk argument that his counsel's decision not to raise it was "outside the wide range of professionally competent assistance." *Bennett*, 663 F.3d at 84 (quoting *Strickland*, 466 U.S. at 690).

Far from being a slam-dunk winning argument, Ground 1 is plainly meritless. Williams's principal argument on this point is that the indictment was jurisdictionally defective because it charged him only with *conspiracy* to commit wire fraud under 18 U.S.C. § 1349, and not the *substantive crime* of wire fraud under 18 U.S.C. § 1343.  (Doc. No. 278 at 25–26.)  He suggests that because 18 U.S.C. § 1349 lacks its own penalty provision, a sentence for conspiracy to commit wire fraud under that section cannot "STAND ALONE," and is therefore "VOID" unless the indictment also charged a count under 18 U.S.C. § 1343 (which *does* contain its own penalty provision).  (Doc. No. 278 at 33–34 (capitalization in original).)

Despite Williams's protestations to the contrary, it is abundantly clear that his sentence was statutorily authorized.  Williams was convicted of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, which provides that "[a]ny person who . . . conspires to commit any offense under this chapter" shall "be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy."  18 U.S.C. § 1349. Sections 1349 and 1343 are both in Chapter 63 (pertaining to "Mail Fraud and Other Fraud Offenses") of Title 18 of the United States Code.  Thus, there can be no doubt that section 1349's reference to "any offense under this chapter" includes the substantive commission of wire fraud under section 1343.  18 U.S.C. § 1349.  And section 1343, for its part, provides clearly that the penalties prescribed for substantive wire fraud include "be[ing] fined under this title or imprisoned not more than 20 years, or both."  18 U.S.C. § 1343.  The statutory text expressly provides that Williams "shall be subject to the[se] same penalties" because he "conspire[d] to commit [the] offense" of wire fraud "under . . . [C]hapter" 63 of Title 18.  18 U.S.C. § 1349.

Equally meritless is Williams's suggestion of some more general, inherent requirement that an indictment must charge a given substantive offense in order to have jurisdiction to charge

conspiracy to commit that underlying offense.  Contrary to Williams's argument that a conspiracy charge "cannot 'STAND ALONE'" (Doc. No. 278 at 26 (capitalization in original)), "[i]t has been long and consistently recognized . . . that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Pinkerton v. United States*, 328 U.S. 640, 643 (1946); *see also Iannelli v. United States*, 420 U.S. 770, 777 (1975) ("Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes.").  For that reason, the Second Circuit has expressly rejected the "argument that [it] is inappropriate [for] the indictment [to] charge[] conspiracy but not the underlying substantive offense." *United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir. 1986).

Because Ground 1 is so plainly meritless, it was undoubtedly not IAC for Williams's pretrial- and trial-stage counsel to decline to raise it. *See, e.g.*, *Johnson v. United States*, 779 F.3d 125, 130 (2d Cir. 2015) ("[C]ounsel's failure to [raise] the arguments [petitioner] advances now was not objectively unreasonable, since those arguments are . . . meritless."); *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999) ("Failure to make a meritless argument does not amount to ineffective assistance."), *abrogated on other grounds by Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003); *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) ("[T]he failure to make a meritless argument does not rise to the level of ineffective assistance.").  Accordingly, Grounds 6, 7, 8, 9, 10, and 11 (each alleging IAC for counsel's failure to raise Ground 1) all fail on the merits.

\*          \*          \*

Because all nineteen of Williams's putative grounds for relief are either jurisdictionally barred, procedurally barred, or meritless, he is not entitled to have the Court "vacate, set aside or correct the sentence" or conviction.  28 U.S.C. § 2255(a).

## IV.   CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Williams's motion under 28 U.S.C. § 2255 is DENIED.  In addition, because Williams has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court will not issue a certificate of appealability.  *See Love v. McCray*, 413 F.3d 192, 195 (2d Cir. 2005).  Furthermore, because any appeal would "lack[] an arguable basis in law or fact," *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995), the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith and, therefore, Williams may not proceed *in forma pauperis*.  *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).  The Clerk of Court is respectfully directed to mail a copy of this order to John Todd Williams.

SO ORDERED.

Dated:        March 25, 2022
              New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation